## MASON v. HEPBURN.

PATENTS; INTERFERENCE; REDUCTION TO PRACTICE; ABANDON-
MENT; LOST ART; PRIORITY.

1. What is successful construction or reduction to practice, depends largely upon the nature and purpose of the machine or device in question, and upon the special circumstances surrounding the alleged construction and use.
2. A drawing of even the simplest machine or device, perfect in every detail and plainly demonstrating the principle, efficacy and practical utility of the invention, will not constitute re-duction to practice, nor will a model, designed, constructed and intended as a model.
3. But the perfect construction of a device known as a clip to be attached to the magazine of a gun, and its attachment to a gun apparently completely finished and ready for sale and use, so as to be demonstrably capable of producing the result sought to be accomplished, is a sufficient reduction to practice.
4. While actual test of the restraining power of such a device under the strain of repeated firing of the gun, might be of import-ance in demonstrating its value, it is not necessary to the com-pletion of the inventive act.
5. Where the construction and adaptation of such a device by the inventor is known only to him and several fellow-employees in a factory, the invention is as much secreted from the public as if confined to the knowledge of the inventor alone, and where seven years intervene between such construction and an application for a patent, there is no abandonment to public

use; and the mere lapse of time will not prevent the inventor from receiving a patent.

6. If after the construction and adaptation of such a device, the gun to which it is attached is stored away and apparently forgotten for several years, during which time the inventor takes out patents for a magazine gun and for another clip, and the old device is only recalled upon the application by another inventor, whose conception was later, for a patent for a similar device, the first invention can not, by reason of the secretion or forgetfulness of its inventor, be said to be a lost art.

7. But, under such circumstances, in an interference proceeding between the two inventors, the claim of priority of the first inventor will be held to be barred by his designed or negligent concealment of his invention from the public and the subsequent entry of his rival in the apparently unoccupied field, and the latter will be entitled to the patent.

Patent Appeals. No. 79. Submitted May 9, 1898. Decided June 7, 1898.

HEARING on an appeal from a decision of the Commissioner of Patents in an interference proceeding. *Affirmed.*

The facts are sufficiently stated in the opinion.

*Messrs. Earle & Seymour* for the appellant.

*Mr. Robert C. Mitchell* for the appellee.

Mr. Justice SHEPARD delivered the opinion of the Court:

1. This is an appeal from the decision of the Commissioner of Patents in an interference proceeding with the following issue:

"In a magazine-firearm, the detachable end piece for closing the outer end of the magazine provided with upwardly-projecting curved arms to clasp the sides of the barrel, substantially as described."

The device is a clip made in one piece instead of two, as formerly, one end of which is made to fit closely in the upper end of the magazine. The other is split or divided into two curved arms, which are elastic and clasp each side of the gun-barrel far enough around to hold securely without meeting each other. A side screw at the junction of

the magazine and barrel holds tight the clasp or releases it, as desired.

Hepburn received a patent for this invention September 11, 1894. Having taken no testimony, his date of invention must be confined to that of his application, filed April 3, 1894.

Mason's application was filed December 31, 1894. Mason offered testimony tending to show that he conceived the invention about June 28, 1887, on which date he made a complete drawing showing the device; that a working drawing was traced from that in July, 1887, and the clip made in the shops of the Winchester Repeating Arms Company; that during the same month a new "take-down" shotgun was made with this clip attached, which was tested, probably, in the shooting-gallery. This gun was stored in the model-room of the same company until produced in the course of the trial of this controversy. No clips of the kind were manufactured for any other purpose, and no similar gun was made. No exhibition of the gun and clip was made to the public, and no one saw it besides the inventor and one or two other employees of the Winchester Company.

It appears that Mason filed an application for a patent for a detachable or "take-down" gun April 4, 1892, and the same was issued to him December 6, 1892. In this no mention is made of the device for clipping the upper end of the magazine to the barrel. On the same day, however, he received a patent for a clip for which he applied August 1, 1892. This is made with projecting curved arms, as in the device of the controversy, to clasp the gun-barrel; but at the other end it has a hole made to receive the end of a pin on a separate piece that closes the end of the magazine.

2. The testimony is sufficient to warrant the conclusion, in which all of the tribunals of the Patent Office have concurred, that Mason conceived the idea of this invention at the time claimed, and that the gun, with the device attached, was actually completed and ready for use in July,

1887. They have not agreed, however, in respect of the sufficiency of the evidence to show with the required certainty that the gun, when constructed, was actually tested by firing in a manner that demonstrated the completeness and practical utility of the device of the controversy.

What is successful construction—that is to say, the embodiment of the inventor's conception in a substantial form, which demonstrates at once its practical utility, constituting reduction to practice or use in the sense of the patent law —is a matter the determination of which must largely depend upon the nature and purpose of the machine or device in the particular case, as well as upon the special circumstances surrounding the alleged construction and use.

It is settled beyond all question, that a drawing of even the simplest machine or device, perfect in every detail, and plainly demonstrating the principle, efficacy, and practical utility of the invention, will not constitute reduction to practice. Nor will the requirements of reduction to practice or use be satisfied by a construction clearly designed and intended as a model and nothing more. They are but evidences of conception, furnishing the foundation of an award of priority when accompanied by proof of subsequent diligence in the matter of actual reduction to practice. *Porter* v. *Louden,* 7 App. D. C. 64, 74. At the same time some devices are so simple, and their purpose and efficacy so obvious, that the complete construction of one of a size and form intended for and capable of practical use might well be regarded as a sufficient reduction to practice, without actual use or test in an effort to demonstrate their complete success or probable commercial value. This doctrine is maintained in the following cases: *Stitt* v. *Eastern RR. Co.,* 22 Fed. R. 649; *Sayles* v. *C. & N. W. RR. Co.,* 4 Fish. 584; *Parker* v. *Ferguson,* 1 Blatchf. 407; *Pitts* v. *Wemple,* 2 Fish. 10, 15.

In such instances, however, the fact that the construction of the device had not been followed within a reasonable time by practical or commercial use or application for

patent, would afford a strong inference that what had been
done was regarded by the inventor as experimental only
and not completion of invention, and this would be materi-
ally reinforced if in the meantime the machine had been
dismantled or destroyed.   It appears in this case that the
Winchester Repeating Arms Company, which is the assignee
of Mason, did not make or use another of these clips.   The
gun was laid away, and no application for a patent was
made until three months after the patent to Hepburn had
issued.   Five years after its completion, a patent for the
detachable gun, or one nearly resembling it, was applied
for without mention of the clip as a part of the combina-
tion, and then, some months later still, a patent was applied
for and obtained for a clip working in the same general
way, but made in two pieces.

Two of the board of examiners-in-chief agreed· on revers-
ing the decision of the examiner of interferences, because
they were not satisfied with the evidence of reduction to
practice.   They said :

"The clip evidently performs its expected office.   Whether
in use with no other means for holding it to the barrel and
magazine than the clips and the sockets, the construction is
adapted to practical use, has not been proven, and can not
be decided by us on a mere inspection of the gun.   It has
not been certainly established that this clip was ever proven
to be perfected and adapted to practical use."

In reaching this conclusion they laid much stress upon
the subsequent inaction of the inventor, and from their point
of view rightly so.

In reaching our own conclusion, we regard the examina-
tion of the evidence in respect of the actual firing test of the
gun as immaterial, because, in our opinion, the reduction
to practice of the clip was accomplished by its perfect con-
struction and attachment to a gun apparently completely
finished and ready for sale and use.   It was demonstrably
capable of producing the result sought to be accomplished—

namely, that of closing the magazine and clipping it to the barrel. As admitted by the examiners, " the clip evidently performs its expected office."

Actual test of the restraining power under the strain of repeated firing of the gun might be of importance in demonstrating the value of the clip, but was not necessary to the completion of the inventive act. *Hall* v. *Macneale,* 107 U. S. 90, 97.

3. Although the construction and adaptation to use of the clip were within the knowledge of several persons, these were all, with Mason himself, employees of the Winchester Repeating Arms Company, for whose benefit the invention was made. They had either been called on to aid in the construction and use, or, by the nature of their employment, were necessarily cognizant of it. The invention was therefore as much secreted from the public as if it had been confined to the knowledge of Mason alone. *Pennock* v. *Dialogue,* 1 Pet. 1, 19; *Kendall* v. *Winsor,* 21 How. 322, 330.

The public did not and was not intended to receive any benefit from it during the seven years that intervened between the construction and the application for the patent. Not having been given or abandoned to public use, there was nothing in the mere lapse of time to prevent Mason receiving a patent. *Bates* v. *Coe,* 98 U. S. 31, 46.

It seems that Mason attached no importance to the invention, for there is not a fact in evidence to account otherwise for his long inaction. Besides, as we have seen, he had in the meantime procured a patent for a gun, and on the same date another for a different clip to secure the magazine to the barrel. Apparently, the invention as a thing of value had passed out of his mind, to which it was recalled by seeing the publication of the patent to Hepburn in the Official Gazette.

It is unquestioned that Hepburn's invention was an independent act; that he had no knowledge whatever of the

work done by Mason, and that when he applied for and received his patent, he in good faith believed himself to be the original and only inventor.

In this state of the case, it remains to be considered, whether the Commissioner, maintaining the view expressed in a separate opinion of one of the examiners-in-chief, was right in awarding priority to Hepburn on account of this conduct of Mason in purposely withholding his invention from the public without excuse for the period of more than seven years.

First. In our opinion, the decision can not be upheld on the ground that the invention, by reason either of secretion or forgetfulness on the part of Mason, had become, as it were, a lost art. It is true, that to entitle one to a patent for the discovery of a lost art, it does not seem to be necessary that it shall have been buried and unknown for ages or even for any great length of time. *Gayler* v. *Wilder*, 10 How. 477, 497, 498; *Hall* v. *Bird*, 6 Blatch. 438; *Taylor* v. *Wood*, 12 Blatch. 110, 121; *Converse* v. *Mathews*, 58 Fed. R. 246, 249; 1 Rob. on Pats., Sec. 323.

But it is necessary that the knowledge of the art or the improvement therein shall have completely disappeared. It must at least have been so far forgotten that its inventor, if living, or others who may have witnessed its use, would not be able to recall it to memory and reproduce it without the assistance of the description made of the subsequent discovery. *Rich* v. *Lippincott*, 2 Fish. 1, 8.

Now, if this device had been lost or destroyed by Mason, that fact, coupled with his subsequent invention and patent of another and different one to accomplish the same purpose, might be sufficient to uphold the patent to Hepburn, as the inventor of a new and useful manufacture or improvement " not known or used by others" before his discovery, as those words are used in the law. Rev. Stat., Sec. 4886; *Gayler* v. *Wilder*, 10 How. 477, 498. In that case, where it was made to appear that a safe similar in construction to

the patentee's had been made and used some years before by one Conner, the court, construing the like words in the act of 1836, said:

" The court put it to the jury to say whether this safe had been finally forgotten and abandoned before Fitzgerald's invention, and whether he was the original inventor of the safe for which he obtained the patent; directing them, if they found these two facts, that their verdict must be for the plaintiff. We think there was no error in this instruction. For if the Conner safe had passed away from the memory of Conner himself, and of those who had seen it, and the safe itself had disappeared, the knowledge of the improvement was as completely lost as if it had never been discovered. The public could derive no benefit from it until it was discovered by another inventor. And if Fitzgerald made his discovery by his own effort, without any knowledge of Conner's, he invented an improvement that was then new, and at that time unknown; and it was not the less new and unknown because Conner's safe was recalled to his memory by the success of Fitzgerald's."

The facts of this case, however, are quite different. The clip had not been lost or destroyed or even removed from the gun. It was where the inventor could readily put his hand upon it. Reminded simply of its existence or possible value by the publication of the patent to Hepburn, he required no assistance from the specification of that patent to aid him in again making and using it. He may have forgotten that he had made it and been reminded of it by the grant of Hepburn's patent, but it can not be said to have been so far forgotten as to have become what is called a lost art.

Second. The remaining question is, can the decision be upheld upon the ground that Mason's right to claim of priority has become barred by his designed or negligent concealment of his invention from the public and the subsequent entry of his rival in the apparently unoccupied field?

We concur with the Commissioner in the answer to this

question, that under the circumstances Hepburn must be held to be the first inventor in the sense of the law regulating the grant of patents. Rev. Stat., Sec. 4886.

A liberal interpretation of the words of the statute is demanded in the interest of the public for the advancement of which the patent laws were enacted. *Kendall* v. *Winsor*, 21 How. 322, 327, 328. In the opinion in that case it was said:

"The true policy and ends of the patent laws enacted under this Government are disclosed in that article of the Constitution, the source of all' these laws, viz., 'to promote the progress of science and the useful arts,' contemplating and necessarily implying their extension and increasing adaptation to the uses of society. *Vide* Constitution of the United States, Art. 1, Sec. 8, Clause 8. By correct induction from these truths it follows that the inventor, who, designedly, and with a view of applying it indefinitely and exclusively for his own profit, withholds his invention from the public, comes not within the policy or objects of the Constitution or acts of Congress. He does not promote and, if aided in his design, would impede the progress of science and the useful arts; and with a very bad grace could he appeal for favor or protection to that society which, if he had not injured, he certainly had neither benefited nor intended to benefit. Hence, if, during such a concealment, an invention similar to or identical with his own should be made and patented or brought into use without a patent, the latter could not be inhibited nor restricted upon proof of its identity with a machine previously invented and withheld and concealed by the inventor from the public. The rights and interests, whether of the public or individuals, can never be made to yield to schemes of selfishness or cupidity; moreover, that which is once given to or is invested in the public can not be recalled nor taken from them."

That case was, it is true, an action for infringement by a patentee against one who before the application for the

patent had made use of his invention without claim, himself, of discovery. The right was claimed in the patentee, on the one hand, as against the right of the public on the other. Nevertheless, we think that our conclusion is in strict conformity with the principles which it enounces, and there is nothing in it inconsistent with the spirit of indulgence that has always been manifested toward those who in good faith delay application for patent whilst engaged in a diligent effort to perfect their inventions. *Idem*, p. 329; *Agawam Co.* v. *Jordan*, 7 Wall. 589, 607; *Yates* v. *Huson*, 8 App. D. C. 93, 98.

Considering, then, this paramount interest of the public in its bearing upon the question as presented here, we think it imperatively demands that a subsequent inventor of a new and useful manufacture or improvement who has diligently pursued his labors to the procurement of a patent in good faith and without any knowledge of the preceding discoveries of another, shall, as against that other, who has deliberately concealed the knowledge of his invention from the public, be regarded as the real inventor and as such entitled to his reward.

This right of the second discoverer has been recognized with considerable uniformity for a number of years in the administration of the Patent Office. Duncan, Acting Commissioner, in *Monce* v. *Adams*, 1 O. G. 1; Paine, Commissioner, in *Mallett* v. *Cogger*, 16 O. G. 45, and *Farmer* v. *Brush*, 17 O. G. 150; Marble, Commissioner, in *Sheridan* v. *Latus*, 25 O. G. 501. And again recently by Commissioner Duell, in whose decision the authorities are extensively reviewed. *Mower* v. *Crisp & Copeland*, 83 O. G. 155.

It has the sanction also of the following judicial decisions: *Rowley* v. *Mason*, 2 Am. Law Times Rep. 106; *Consolidated Fruit Jar Co.* v. *Wright*, 12 Blatch. 149; *U. S. Rifle and Cartridge Co.* v. *Whitney Arms Co.*, 14 Blatch. 94, 101; *Boyd* v. *Cherry*, 4 McCreery, 70, 77; *Cahoon* v. *Ring*, 1 Cliff. 610; *White* v. *Allen*, 2 Fish. 440, 454.

In *Bates* v. *Coe*, 98 U. S. 31, 46, the point was not directly involved; but Mr. Justice Clifford, in affirming the right of the inventor to keep his invention secret for any length of time without forfeiting his right to a patent, coupled it with the following exception, as if one of unquestioned application, namely: " Unless another in the meantime has made the same invention, and secured by patent the exclusive right to make, use and vend the patented improvement. Within that rule, and subject to that exception, inventors may delay to apply for a patent."    See, also, 1 Robinson on Patents, Sec. 390.

In some of the decisions the first inventor is regarded as having abandoned the field to other inventors, whilst in others he is held to have lost his right by sleeping too long upon it.

Strictly speaking, abandonment after the completion of the inventive act applies in a case where the right of the public to the use is involved, and not in one where the contention is between rival claimants merely of the monopoly.

The true ground of the doctrine, we apprehend, lies in the policy and spirit of the patent laws and in the nature of the equity that arises in favor of him who gives the public the benefit of the knowledge of his invention, who expends his time, labor, and money in discovering, perfecting, and patenting, in perfect good faith, that which he and all others have been led to believe has never been discovered, by reason of the indifference, supineness, or wilful act of one who may, in fact, have discovered it long before.

It follows that the decision of the Commissioner must be affirmed.    It is so ordered, and this decision will be certified to the Commissioner of Patents, in accordance with the law.

*Affirmed.*